**SO ORDERED.**

**SIGNED this 28 day of September, 2018.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    CASE NO. 16-03464-5-DMW

**JULIE FAENZA HALATEK**

                          **CHAPTER 7**

      **DEBTOR**

---

**JULIE FAENZA HALATEK**

      **PLAINTIFF**

   **vs.**                                                **ADVERSARY PROCEEDING NO.**

**WILLIAM D. FORD FEDERAL**                    **16-000150-5-DMW**
**DIRECT LOAN (DIRECT LOAN)**
**PROGRAM/UNITED STATES**
**DEPARTMENT OF EDUCATION and**
**NAVIENT PRIVATE LOAN TRUST,**

      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the court upon the Department of Education's Motion for

Summary Judgment ("Summary Judgment Motion") filed by the United States of America

("Defendant"), on behalf of the United States Department of Education and the William D. Ford

Federal Direct Loan Program, on November 8, 2017 and the Response thereto filed by Julie Faenza Halatek ("Plaintiff") on February 8, 2018. The court conducted a hearing on April 24, 2018 in Raleigh, North Carolina. C. Michael Anderson, Esq. appeared for the Defendant, and Douglas Q. Wickham, Esq. appeared for the Plaintiff. At the conclusion of the hearing, the court took the matter under advisement. After consideration of the undisputed facts presented by the parties in their pleadings, memoranda, and affidavits and of the arguments of counsel, the court grants summary judgment in favor of the Defendant pursuant to Rule 56 of the Federal Rules of Civil Procedure, incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure, for the reasons set forth herein.

## I. PROCEDURAL BACKGROUND

The Plaintiff filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code[1] on July 1, 2016 and received a discharge pursuant to § 727 on September 28, 2016. On September 23, 2016, the Plaintiff initiated this adversary proceeding by filing timely a Complaint for § 523(a)(8) Undue Hardship Discharge of Education Loans ("Complaint") against the Defendant and Navient Private Loan Trust ("Joint Defendant"). In the Complaint, the Plaintiff prays the court to determine that certain debts for educational loans should not be excepted from her discharge pursuant to § 523(a)(8), because the nondischargeability of these loans imposes on her an undue hardship.

On October 27, 2016, the Plaintiff and the Joint Defendant filed a Stipulation for Discharge of Educational Loan Debt between Plaintiff and Navient Solutions, Inc. and for Dismissal of Navient Private Loan Trust as a Defendant in this Adversary Proceeding ("Stipulation"). In the Stipulation, these parties agreed to a discharge of the Plaintiff's indebtedness to the Joint

---

[1] Except for within formal citations, references to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

Defendant as represented by a promissory note executed by the Plaintiff to obtain an educational loan which was disbursed on April 15, 2011.  The court approved the Stipulation and dismissed the Joint Defendant from this adversary proceeding pursuant to an Order Approving Stipulation for Discharge of Educational Loan Debt between Plaintiff and Navient Solutions, Inc. and Dismissing Navient Private Loan Trust as a Defendant in this Adversary Proceeding entered on November 23, 2016.

On December 5, 2016, the Defendant filed the Department of Education's Answer, denying that the Plaintiff's indebtedness to the Defendant is dischargeable.  After completion of discovery, the Defendant filed the Summary Judgment Motion, asserting that no genuine dispute exists as to any material fact, and the Defendant is entitled to judgment as a matter of law.

## II. JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) which the court has the authority to hear and determine pursuant to 28 U.S.C. § 157(b)(1). *See Kelly v. U.S. Dep't. of Educ. (In re Kelly)*, 548 B.R. 99, 101 (Bankr. E.D.N.C. 2016) (finding that action to determine dischargeability of educational loans is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).  The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## III. SUMMARY JUDGMENT STANDARD

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When ruling upon a motion for summary judgment, "the court must consider whether a reasonable jury could find in favor of the non-moving party, taking

all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *Humboldt Express, Inc. v. The Wise Co., Inc. (In re Apex Express Corp.)*, 190 F.3d 624, 633 (4th Cir. 1999) (citations omitted). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 519 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(c) (1963) (amended 2010)).

## IV. FACTUAL BACKGROUND

In addition to the admitted factual allegations contained in the pleadings, the parties provided the court with a plethora of facts and information obtained in the discovery process. The court summarizes below the undisputed facts relevant to its consideration of the Summary Judgment Motion.

### A. Plaintiff's Medical Conditions

The Plaintiff, who is approximately 37 years old, is afflicted primarily with two chronic medical conditions: Hypermobile Ehlers-Danlos Syndrome ("hEDS") and narcolepsy. hEDS is a genetic condition which the Plaintiff has carried her entire life. She was not diagnosed formally with hEDS until January 2016 but had repeated sprains, strains, and tendonitis throughout her childhood that were likely caused by hEDS. As a young adult, she suffers from arthritis and other painful musculoskeletal conditions. The Plaintiff was diagnosed with narcolepsy in April 2014 after numerous years of experiencing extreme fatigue and exhaustion. She believes the condition developed during her teenage years as an autoimmune response triggered by an upper respiratory infection.

The Plaintiff asserts that her hEDS and narcolepsy, together, cause her constant pain and exhaustion, often resulting in "brain fog" and the inability to think clearly. She has suffered from migraines since the age of 17 and believes they are likely a symptom of hEDS. The Plaintiff also experiences cataplexy as a condition of her narcolepsy, causing weakness in her legs. She claims this weakness affects her ability to stand and walk when experiencing extreme emotions such as happiness, excitement, anger, or stress. The Plaintiff manages her hEDS, narcolepsy, and related conditions with various medications and positive-thinking techniques; however, she says the symptoms are a continuing problem at work, and she believes that her health is deteriorating.

B. Plaintiff's Education and Employment History

The Plaintiff graduated *cum laude* from Western Connecticut State University in May 2003, receiving a Bachelor of Science in Justice and Law Administration. She moved to North Carolina in 2006 and began working with Bath and Body Works. She thereafter obtained a full-time position with Blue Cross Blue Shield ("BCBS") but continued with Bath and Body Works part-time for extra income.

The Plaintiff's college studies sparked a desire to become an attorney, and in August 2007, she entered a four-year night program at North Carolina Central University School of Law. She resigned from her job with Bath and Body Works to concentrate on her legal studies but continued working full-time with BCBS throughout her time in law school. She made the Dean's List every semester and graduated *cum laude* in May 2011. Subsequently, the North Carolina State Bar granted the Plaintiff a license as a result of her passing the licensing examination. The Plaintiff then began searching and applying for employment opportunities in the legal profession.

On October 1, 2012, the Plaintiff joined the North Carolina Department of Health and Human Services ("NCDHHS") as a Project Analyst in the Healthcare Planning and Certificate of

Need Section. While this position does not require a law license, the Plaintiff's legal background and experience is beneficial and was a factor in her hiring. The Plaintiff remains employed with the NCDHHS but continues to seek alternate employment, professing to have applied for at least 100 attorney positions. She states she will not take a position that requires litigation, because her health conditions make it difficult for her to tolerate being on her feet or in high-stress situations.

The Plaintiff works generally 40 hours per week at the NCDHHS but has occasionally missed time because of her medical conditions, sometimes taking unpaid leave. The Plaintiff's supervisor, Elisabeth Pittman, is aware of these conditions and acknowledges that it has affected some aspects of the Plaintiff's employment but reports that the Plaintiff is bright, knowledgeable, and works hard. Her job performance meets or exceeds expectations, and she has not missed any significant appointments or deadlines because of her illnesses. The Plaintiff is a permanent employee with the State of North Carolina and cannot be terminated at will. Ms. Pittman does not believe the Plaintiff has ever been considered for termination and enjoys working with her.

With approval of the NCDHHS, the Plaintiff has engaged in secondary work, including being an independent beauty consultant with Mary Kay during at least the years of 2012-2014. Since 2015, the Plaintiff has contracted jobs with Sotomayor IP Consulting, LP ("Sotomayor"), an intellectual property consulting firm, to assist with patent and intellectual property research and preparation of patent applications. The Plaintiff expresses interest in returning to law school to prepare for the patent bar examination administered by United States Patent and Trademark Office, but she claims to lack the necessary stamina.

C. Plaintiff's Federal Educational Loans

1. Amounts Borrowed

To finance her education, the Plaintiff borrowed from the Defendant a total of $114,783.09 through twelve loans as follows:  the sum of $82,000.00 ("Loans 1-8") received through four annual disbursements of $20,5000 made each August (2007-2010) commencing the Plaintiff's years of law school; the amount of $9,186.00 ("Loan 9") disbursed on August 10, 2010 at the beginning of the Plaintiff's final of law school year; the amount of $18,444.32 ("Loans 10-11") disbursed on June 15, 2012 to consolidate unpaid undergraduate loans; and the amount of $5,152.77 ("Loan 12") disbursed on September 6, 2013.

2. Payment History

The Defendant deferred payment on Loans 1-8 and on Loan 9 while the Plaintiff attended law school and for a short time following her graduation.  The Plaintiff's first payment on Loans 1-8 was due in November 2011.  She did not make this payment and began a $0.00 repayment plan for Loans 1-8 in December 2011 that lasted through July 2013.

In December 2011, the Plaintiff made the first payment due on Loan 9 in the amount of $122.16, but in January 2012, she began a $0.00 repayment plan for Loan 9 that lasted through December 2012.  Thereafter, the Plaintiff made the regular monthly payment in the amount of $120.59 on Loan 9 from January 2013 through July 2013.

Loans 10-11 were in forbearance from their incurrence on June 15, 2012 through July 20, 2012.  After this period, the Plaintiff made regular monthly payments of $54.54 total for Loans 10-11 from August 2012 through July 2013.

In August 2013, the Plaintiff began making payments under the Income-Based Repayment Plan ("IBR").  This program determines appropriate monthly payments based upon the obligor's

family size and adjusted gross income from the previous tax year and requires annual recertification of this information.  Under the IBR, the Plaintiff made monthly payments of $192.85 total for Loans 1-11 from August 2013 through September 2013.  After the incurrence of Loan 12, the Plaintiff's monthly payment amount increased to $193.14 total for Loans 1-12, and the Plaintiff made these payments from October 2013 through July 2014.

In April 2014, as part of her IBR recertification, the Plaintiff submitted documents reflecting an increased adjusted gross income which presumably resulted from her employment with the NCDHHS.  The Plaintiff's total monthly payment amount for Loans 1-12 rose to $492.84, beginning with the August 2014 payment.  The Plaintiff did not make any payments at this new amount and instead sought forbearances of her loans.

On December 24, 2015, the Plaintiff requested to change from the IBR to the Revised Pay As You Earn ("REPAYE") program but did not want to make any payments until her forbearance period ended.  On May 3, 2016, she renewed the request to make payments under the REPAYE program, and based upon her adjusted gross income certified with that request, the monthly payments would be $492.28.  The Defendant required a payment to complete the change from IBR to REPAYE and granted the Plaintiff a reduced payment amount of $4.98 due by June 30, 2016 to effectuate the program change.  The Plaintiff did not make this payment and filed her bankruptcy petition on July 1, 2016.

Since her loan repayment period began in 2011, the Plaintiff has paid a total of $3,937.87 toward her 12 loans, which have all been in forbearance since August 20, 2014.  As of October 31, 2017, the total amount the Plaintiff owes the Defendant, including accrued interest, was $164,207.29.

### 3. Repayment Options

The Plaintiff continues to be eligible for the REPAYE program under which a borrower pays ten percent of her "discretionary income," which is the difference between her adjusted gross income and 150 percent of the federal poverty guideline amount for the borrower's state of residency and family size. Based upon information concerning the Plaintiff's adjusted gross income for 2017, the Plaintiff's projected monthly payment under the REPAYE program would currently be $362.00.[2]

As an employee of the State of North Carolina, the Plaintiff is also eligible for the Public Service Loan Forgiveness ("PSLF") program. Under this program, full-time employees of state agencies are eligible for forgiveness of all remaining debt owing after making 120 qualifying monthly payments, including payments made under an income-driven plan such as IBR or REPAYE. The Plaintiff has already made 19 payments on Loans 1-11 and seven payments on Loan 12 that count toward the 120 payments required for forgiveness under the PSLF program.[3]

If a borrower is unable to make a payment for one or more months, then she may be eligible for a temporary forbearance or deferment, including up to three years of relief under the Unemployment Deferment or Economic Hardship Deferment. Should a borrower become unable to work because of disabling medical conditions, she may apply for a Total and Permanent Disability Discharge. If the application is granted, then the borrower's entire debt is discharged after successful completion of a three-year monitoring period.

---

[2] This amount is less than the amount of $492.28 determined when the Plaintiff applied for the REPAYE program in 2016, because her applicable adjusted gross income at that time included earnings from her now ex-husband.

[3] These qualifying payments do not include payments made by the Plaintiff after April 2014, because the Plaintiff never recertified her full-time state employment after that time.

D. Plaintiff's Financial Condition

1. Pre-Petition

The Plaintiff married Robert Halatek in May 2011, around the time of her graduation from law school.  They separated in March 2016, shortly prior to the Plaintiff's bankruptcy petition, and are now divorced.  The Plaintiff and Mr. Halatek filed joint income tax returns for the years 2012-2016 reporting the following combined adjusted gross income:

| | |
|---|---|
| 2012 | $ 40,561.00 |
| 2013 | $ 50,966.00 |
| 2014 | $ 50,034.00 |
| 2015 | $ 76,332.00 |
| 2016 | $ 82,592.00 |

Most of this income is attributable to the Plaintiff, as during the early years of their marriage, Mr. Halatek was still in school and only had VA disability and stipend income.  At the time of their marriage in 2011, the Plaintiff's annual salary with BCBS was approximately $33,000.00.  Her starting salary at NCDHHS in October 2012 was $64,214.00 and climbed to $66,192.00 by 2016.  In addition to her salary from NCDHHS, the Plaintiff earned from Sotomayor $1,470.00 in 2015 and $2,590.00 in 2016.

The record lacks the amount of the household expenses incurred by the Plaintiff and Mr. Halatek during their marriage; however, the Plaintiff attested that Mr. Halatek has two children from a previous marriage, and they purchased a house to provide a home for these children when they visited.  Around the time of their marriage, they also purchased a timeshare in Williamsburg, Virginia where they vacationed two or three times.  They made monthly mortgage payments on the timeshare and were required to pay annual ownership fees.  The most recent mortgage payment amount the Plaintiff recalls was $69.00, which she says is less than what was initially paid, because they downgraded their timeshare benefits after a few years.  She believes the annual fee is

10

approximately $200.00.  Upon their separation, Mr. Halatek assumed financial responsibility for this timeshare.

## 2. Bankruptcy Schedules

The Plaintiff's Schedule I reports that at the time of her petition, the Plaintiff had a monthly gross income of $4,678.00[4] from her employment with NCDHHS, with a monthly take-home pay of $3,227.00.  Schedule J lists monthly expenses totaling in excess this take-home pay:

| | | | | |
|---|---|---:|---:|---:|
| Rent | | | $ | 799.00 |
| Property Insurance | | | | 26.68 |
| Utilities | | | | |
| | Electricity, Gas | $ | 81.50 | |
| | Water | | 41.50 | |
| | Cellular Service | | 67.81 | |
| | Cable/Internet | | 34.99 | |
| | Netflix | | 8.53 | |
| | Sirius XM Radio | | 24.32 | |
| | MLB.tv | | 10.83 | |
| | Total | | | 269.48 |
| Food and Housekeeping | | | | 700.00 |
| Clothing, Laundry, Dry Cleaning | | | | 100.00 |
| Personal Care | | | | 67.00 |
| Medical and Dental | | | | 350.00 |
| Transportation, Gas | | | | 350.00 |
| Entertainment | | | | 28.41 |
| Charitable Contributions | | | | 20.00 |
| Insurance | | | | |
| | Auto | $ | 61.87 | |
| | Accidental Death | | 35.88 | |
| | Total | | | 97.75 |
| Auto Loan | | | | 405.61 |
| Other | | | | |
| | NC Bar Association Dues | $ | 14.58 | |
| | 10th Judicial District Dues | | 4.17 | |
| | Wake County Bar Dues | | 6.25 | |
| | NC State Bar Dues | | 27.08 | |
| | Continuing Legal Education | | 30.00 | |
| | Pet Care | | 95.00 | |
| | Total | | | 177.08 |
| TOTAL EXPENSES | | | | $ 3,391.01 |

---

[4] This amount equates to an annual gross income of $56,136.00, which is significantly less than the Plaintiff's 2016 salary of $66,192.00.

3. Post-Petition

On or about August 25, 2016, the Plaintiff executed a Reaffirmation Agreement pursuant to which she reaffirmed under § 524(c) a loan secured by her 2015 Ford Escape, committing to make monthly payments in the amount of $405.61 through October 2021.  The required cover sheet filed with the Reaffirmation Agreement reflects that the Plaintiff had reduced her monthly expenses from the $3,391.01 reported in Schedule J to $3,225.00; however, specific reductions were not identified.

Through discovery in this adversary proceeding, the Plaintiff provided the Defendant with financial information and records which were analyzed succinctly in an affidavit provided by Shannon Titch, an auditor with the United States Attorney for the Eastern District of North Carolina.  Ms. Titch reported that the Plaintiff's annual income has risen steadily since she began employment with the NCDHHR and will continue to do so, with an anticipated salary of $68,432.00 in 2022.

For the 13 months of July 2016 through July 2017, the Plaintiff's average take-home pay was $3,530.95, over $300.00 more than as reported in Schedule I.  During this same 13-month period, the Plaintiff's monthly expenses averaged $3,657.83.  The Plaintiff uses a budgeting program to record her expenses, and the program reflects "Discretionary Spending" during this time of the following average monthly expenses:

| | |
|---|---|
| Clothing, Toiletries, Jewelry | $ 165.70 |
| Carolina Harmony Chorus | 116.55 |
| Smartphone and Wireless Service | 86.07 |
| Hair Care and Coloring | 84.81 |
| Gifts | 43.78 |
| "Fun Money" (*e.g.,* snacks, lottery tickets) | 41.23 |
| SiriusXM Radio | 20.85 |
| NC Bar Association Dues | 11.15 |
| Netflix | 10.02 |
| Amazon Prime | 7.69 |

| | |
|---|---|
| MLB.tv | 5.65 |
| "Stuff I Forgot to Budget For"[5] | 212.27 |
| TOTAL | $ 805.77 |

The Plaintiff has eliminated some of her expenses, including canceling HBO Now and MLB.tv, reducing her SiriusXM Radio package, trading her smartphone for a lower cost phone and package, and rehoming her cats.  She explained her decision to maintain other expenses that may appear excessive or unnecessary.  For instance, she does not want to downgrade her vehicle and believes having a newer vehicle and extended warranty coverage will lessen future repair expenses.  The sport-utility vehicle's size is necessary for the transport of her handicapped mother.  Although the Plaintiff is not practicing law, she believes belonging to voluntary professional associations will enable her to network and be beneficial in obtaining a job in the legal field.  Finally, the Plaintiff relishes her participation with the Carolina Harmony Chorus, a women's *a cappella* group.  Music has always been an important element of her life, and she contends that cutting the expenses associated with this recreational outlet would create an undue hardship.

Despite ongoing efforts to reduce her monthly expenses, the Plaintiff projects that her medical expenses will rise by approximately $400.00 per month, predominantly because of an anticipated change in her North Carolina Employee Health Plan.  The Plaintiff says she needs uninsured orthodontic work at a cost of $6,580.00 and for which she has already made a $500.00 down payment.  She will finance the remainder over approximately two years.  The Plaintiff also claims a need for jaw alignment surgery at a cost of $7,200.00, but it is unclear if this expense is in addition to the orthodontic treatment.  She says recovery from this surgery will require her to

---

[5] This category includes consumer items such as audiobooks, books, gifts, games, pottery, Blu-ray discs, coloring books, concert lawn chairs, HBO Now subscription, and event tickets.  The Plaintiff clarified that "Stuff I Forgot to Budget For" and "Discretionary Spending" are terms used by her budgeting program and not coined by her.

take unpaid leave from the NCDHHS. The Plaintiff recently updated her prescription for corrected vision and paid $149.00 for new eyeglasses and $652.80 for a year's supply of daily contact lenses.

On the day of the hearing, the Plaintiff provided the court with an updated register from her budgeting program which provides income and expense detail for the months following Ms. Titch's analysis; however, this update does not reflect a significant change in the Plaintiff's overall financial condition and will not be summarized by the court.

## V. DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that "*unless* excepting such debt from discharge under this paragraph would impose an *undue hardship* on the debtor and the debtor's dependents," a Chapter 7 discharge does not discharge an individual debtor from any debt for—

> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>     (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8) (emphases added). Each of Loans 1-12 given by the Defendant to the Plaintiff qualifies as a type of student loan that is not discharged unless the Plaintiff can establish that their nondischargeability creates an "undue hardship."

The Bankruptcy Code does not define "undue hardship," but the United States Court of Appeals for the Fourth Circuit analyzed its meaning, noting that "'[u]ndue' generally means 'unwarranted' or 'excessive.'" *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 399 (4th Cir. 2005) (citing *The Random House Dictionary of the English Language* 2066 (2d ed. 1987)). The Fourth Circuit reasoned that—

14

> [b]ecause Congress selected the word "undue," the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship.  The exception would swallow the rule, and Congress's restriction would be meaningless.  As a result, "[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." . . . This heightened standard protects the integrity of the student-loan program and saves it "from fiscal doom." It also ensures public support for the program by preventing debtors from easily discharging their debts at the expense of taxpayers who made possible their educations.

*Id.* at 399-400 (quoting *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087 (9th Cir. 2001) (other citations omitted)).

In *Frushour*, the Fourth Circuit adopted the United States Court of Appeals for the Second Circuit's widely followed, three-part *Brunner* test for consideration of "undue hardship" in Chapter 7 proceedings. *Id.* at 400 (citing *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)).  In *Brunner*, the Second Circuit held that to establish an undue hardship, a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.  This court "is bound by the precedent of the Fourth Circuit Court of Appeals and must apply the *Brunner* test." *Ward v. U.S. Dep't. of Educ. (In re Ward)*, No. 12-00001-8-SWH, 2013 WL 4136093, at *4 (Bankr. E.D.N.C. Aug. 9, 2013) (rejecting argument that the court need not follow *Brunner*).

Under the *Brunner* test a debtor bears the burden of proof and must satisfy all three prongs for student loans to be dischargeable. *Vujovic v. Direct Loans (In re Vujovic)*, 388 B.R. 684, 688

(Bankr. E.D.N.C. 2008).  When applying the *Brunner* test to a motion for summary judgment, the moving defendant "must establish material facts about which there are no genuine issues, which would prevent the Debtor from meeting its burden at trial with respect to at least one of the three prongs." *Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale)*, 529 B.R. 641, 648 (Bankr. M.D.N.C. 2015).

When considering the first prong of the *Brunner* test, a court must look at a debtor's *current*[6] income and expenses, and "examine the debtor's standard of living, 'with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents.'" *U.S. Dept. of Health & Human Servs. v. Smitley*, 347 F.3d 109, 117 (4th Cir. 2003) (quoting *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir. 1996)).  "Satisfying this prong 'requires more than a showing of tight finances.'  Determining whether repayment of a student loan will deprive the debtor of a minimal standard of living requires consideration of the debtor's household income and those expenses necessary to meet his or her basic needs." *Cleveland v. Educ. Credit Mgmt. Corp. (In re Cleveland)*, 559 B.R. 265, 271-72 (Bankr. N.D. Ga. 2016) (quoting *Penn. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995) (other citations omitted)).  This interpretation does not mean, however, that the debtor is "entitled to maintain whatever standard of living she has previously attained, nor the level she would maintain if required to repay the debt.  'Minimal' does not mean preexisting, and it does not mean comfortable." *Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi)*, 505 B.R. 330, 339 (Bankr. S.D. Fla. 2013) (quoting *Educ. Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 817-18 (N.D. Fla. 2003)).  A minimal standard of living—

> is not a fixed measure, and the concept is not defined by bright lines.  The upper
> limits of a minimal standard of living generally allow for a debtor to purchase "the

---

[6] The relevant date for determining whether a debtor has met the minimal standard of living prong is the date of trial. *Nixon v. Key Educ. Res. (In re Nixon)*, 453 B.R. 311, 326 (Bankr. S.D. Ohio 2011) (citations omitted).

basic necessities, such as food, clothing, housing and medical treatment." While it does not relegate a debtor to the depths of "abject poverty," "a minimal standard of living does not accommodate 'luxury type expenses.'" After providing for his or her basic needs, a debtor may not use her [sic] or her financial resources for discretionary expenditures in lieu of repaying student loan creditors.

*Johnson v. Access Group, Inc. (In re Johnson)*, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009) (quoting *Armstrong v. Access Group (In re Armstrong)*, 394 B.R. 43, 54 (Bankr. M.D. Pa. 2008) (other citations omitted)).

In analyzing a debtor's income, the federal poverty guidelines are an appropriate starting point by which to measure a debtor's financial situation. *Gesualdi*, 505 B.R. at 340. The court takes judicial notice of the United States Department of Health and Human Services' poverty guidelines for 2018, which set $12,140.00 as the poverty threshold for a one-person household in North Carolina. U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs (2018), https://aspe.hhs.gov/poverty-guidelines. The Plaintiff's gross income for 2018 will be approximately five times this amount, thus the Plaintiff has an incapable burden of establishing that she cannot maintain a minimal standard of living while paying the Defendant the estimated monthly payment of $362.00 available to her under the REPAYE program. Some courts decline to even consider a debtor's expenses in light of such significant income. *See*, *e.g.*, *Hart v. ECMC (In re Hart)*, 438 B.R. 406, 412 (Bankr. E.D. Mich. 2010) (holding that "[a]lthough the minimal standard of living test does not require a debtor to live below the poverty level, the analysis 'begins and ends' with a debtor's income when it is between two and three times the poverty level."); *Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 28 (Bankr. D. Conn. 1999) (finding that an income between two and three times the poverty level with reasonable expenses permits a minimal standard of living).

17

The Defendant flagged discretionary expenses which total in aggregate more than twice the monthly REPAYE payment available to the Plaintiff.  The Plaintiff argues that she strives to live on a tight budget and is continually trying to reduce her expenses.  She has indeed eliminated some luxuries, but her efforts do not amount to the frugality necessary to meet the first *Brunner* prong.  The court recognizes that the Plaintiff may occasionally have higher than usual medical expenses, but the record lacks support that that her medical expenses are currently beyond her means.  The court is also concerned that in the wake of her bankruptcy discharge, the Plaintiff is taking on additional debt for orthodontic work which may be more cosmetic than medical.  The court does not have sufficient information to make any determination about the anticipated jaw surgery.

The Plaintiff's expenses reflect a very comfortable lifestyle:  she drives a three-year old sport-utility vehicle; wears disposable, daily contact lenses; buys gifts and lottery tickets; and enjoys an array of entertainment such as premium television, movies, and concerts.  These undisputed expenses documented by the Plaintiff, coupled with her undisputed income which is far beyond the poverty level, preclude the Plaintiff from being able to the first *Brunner* prong. With this first prong unreachable, the court does not need to consider the second and third *Brunner* prongs and will enter summary judgment in favor of the Defendant.

## VI. CONCLUSION

The student loans provided by the Defendant enabled the Plaintiff to realize her dream of obtaining a law degree.  Although the Plaintiff is not currently working in the legal profession, she benefitted greatly from her legal education, securing a job at double her previous salary.  She is now tenured in that position, which gives her great financial security in her fresh start, and absent a substantial reversal of her fortune, the Plaintiff is not entitled to a discharge of the student loans

18

which helped her achieve this security.  Every day, the court sees hard-working debtors surviving on much more meager means, and those debtors would gladly assume the Plaintiff's student loan obligations in exchange for her enviable income.

The Plaintiff is also fortunate to be eligible for the PSLF program which will allow her to discharge any remaining debt owing on her student loans after making payments for ten years, while working for the NCDHHS or other state agency.  The Plaintiff has let several years pass without taking advantage of this program but is still eligible to reap its benefits.  The court sympathizes with the Plaintiff's medical plights and recognizes her ability to cope with those infirmities, allowing her to remain productive in her employment and enjoy a comfortable lifestyle. If the Plaintiff's conditions progress to create a more permanent and substantial disability, preventing her from working, then she may be eligible for a discharge of the student loans directly from the Defendant; now therefore,

It is ORDERED, ADJUDED, and DECREED that the Summary Judgment Motion be, and hereby is, granted, and the court shall enter a separate Judgment in favor of the Defendant, declaring the Plaintiff's indebtedness to the Defendant for educational loans to be nondischargeable pursuant to 11 U.S.C. § 523(a)(8).

**END OF DOCUMENT**